WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000
Robert J. Malatak
Eloy A. Peral (*pro hac vice* admissions requested)
Reed T. Cohn
rmalatak@windelsmarx.com
eperal@windelsmarx.com
rcohn@windelsmarx.com

*Attorneys for Bank of Hope*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>Hamilton Street Associates, LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-20342-cmg |

**EMERGENCY MOTION OF BANK OF HOPE FOR ENTRY OF AN ORDER (I) EXCUSING RECEIVER'S COMPLIANCE WITH TURNOVER PROVISIONS OF 11 U.S.C. § 543, (II) AUTHORIZING THE RECEIVER TO REMAIN IN POSSESSION PURSUANT TO 11 U.S.C. § 543(d)(1), AND (III) GRANTING RELATED RELIEF**

Bank of Hope ("BofH"), through its counsel, Windels Marx Lane & Mittendorf LLP, moves for entry of an order attached hereto as **Exhibit "A"** (i) excusing Tim Paulus, Esq. (the "Receiver") of Wick Companies, LLC ("Wick") from compliance with sections 543(a), (b), and (c) of title 11 of the United States Code (the "Bankruptcy Code"); (ii) permitting the Receiver to continue to possess, control, and manage property currently under the Receiver's control pursuant to the Receiver Orders (as defined below); and (iii) granting related relief. In support of this Motion, the BofH relies upon and incorporate by reference the *Declaration of Robert J. Malatak*

and the *Declaration of Tim Paulus* filed contemporaneously herewith and respectfully states as follows:

## I. PRELIMINARY STATEMENT

1. BofH bring this motion to preserve the *status quo ante* due to the harm to the estate of Hamilton Street Associates, LLC (the "Debtor") that would result from divesting the Receiver appointed by a New Jersey state court to oversee the Debtor's real property – a mixed-used, 86-unit building located in Somerset, New Jersey. Before BofH filed its foreclosure action, the Debtor initiated litigation in the Superior Court of New Jersey against the Debtor's minority member and prior management team (John Park, Joseph Lee, and the G2 entities) alleging diversion, theft, and mismanagement of the Debtor and the real property. In response to those highly damning allegations, John Park, Joseph Lee, and the G2 entities themselves alleged that the majority and managing member (Perry Pavicic) was similarly engaged in diversion, theft, and mismanagement of the Debtor and the real property. These corporate abuses, insider dealings, and mismanagement are reflected in copious evidence and sworn affidavits submitted in the state court litigation.

2. These swirl of events were occurring while the Debtor was in default under the loan made by BofH due to, *inter alia*, Debtor's failure to (i) make required payments to BofH, (ii) pay real estate taxes on the Real Property in an amount exceeding $500,000, and (iii) comply with financial reporting requirements and financial covenants, all of which significantly threatened, and continue to threaten, BofH's lien interest. The New Jersey state court expressly based its decision to appoint the Receiver on August 1, 2025 on the allegations of mismanagement and theft made in the member litigation, as well as on the Debtor's failure to satisfy its tax liabilities.

3. Since his appointment, the Receiver has successfully managed the Real Property by preserving its overall value, paying all necessary taxes/assessments, increasing occupancy,

completing emergency repairs, and providing timely financial reporting and transparency to the parties and the state court. Permitting the Receiver to continue his role during the bankruptcy would preserve these benefits for all stakeholders. Moreover, with the state court's approval, the Receiver and Wick conducted an extensive marketing process for the real property that culminated in a $23.5 million executed contract with no financial contingencies that is now in jeopardy due to the bankruptcy filing.

4. Handing control of the real property back to the Debtor's management could have profound negative impacts on the value, management, and stability of the Real Property. Crucially, the competing members of the Debtors remain engaged in litigation, which shows no signs of abating. Further, despite the severity and specificity of the alleged corporate abuses by the members, neither party has subsequently indicated that these corporate abuses have been remedied and/or that internal controls can ever be instituted to ensure the Debtor and real property are managed in a responsible and value-maximizing fashion by prior management.

5. For these and all other reasons set forth in the Motion, this Court should excuse the current Receiver from compliance with sections 543(a), (b), and (c) of title 11 of the United States Code, and permit the Receiver to continue to possess, control, and manage the Real Property, subject to the present Receiver Orders (defined below) to ensure that the present *status quo ante* is maintained.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and (M).

7. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. FACTUAL BACKGROUND

### *a. General Background*

8. The Debtor filed a chapter 11 petition on September 10, 2026 (the "Petition Date") designating itself a single asset real estate case as defined by § 101(51B)) of the Bankruptcy Code.

9. The Debtor owns the real property and improvements located at 510 Hamilton Street, Somerset, New Jersey 08873 (Block: 182, Lot: 1.02) (the "Real Property").[1] The Real Property is a mixed-use building consisting of two (2) commercial units and eighty-four (84) residential apartment units.[2]

10. As further explained below, the Receiver has been managing and operating the Real Property since August 1, 2025 pursuant to orders entered by the Superior Court of New Jersey, Chancery Division for Somerset County (the "State Court") in the foreclosure action impacting the Real Property.

### *b. The BofH Loan*

11. On December 17, 2019, BofH loaned (the "Loan") the Debtor the sum of $20,605,000, and the principal balance was increased to $24,000,000 in May 2022. The Loan is evidenced by a Promissory Note dated December 17, 2019 (the "Original Note") and a GAP Promissory Note dated May 25, 2022 (the "GAP Note" and with the Note, the "Notes").[3] The Loan is secured by the Real Property and rents, among other collateral, pursuant to a Mortgage dated December 17, 2019, a Mortgage Modification and Extension Agreement dated May 25, 2022, an Assignment of Leases and Rents, and a Commercial Security Agreement (the "Security Agreement").[4]

---

[1] Malatak Decl. ¶ 4.
[2] *Id.* ¶ 5.
[3] Malatak Decl. Ex. A – Notes.
[4] Malatak Decl. Ex. B – Mortgage, Ex. C – Assignment of Lease and Rents, Ex. D – Security Agreement.

12. The Debtor and BofH entered into a Change in Terms Agreement dated May 25, 2022 to extend the maturity date of the Original Note to May 25, 2025 (the "Maturity Date"), reduce the interest rate from 4.00% to 3.95%, and to reflect an increase in the principal balance to $24,000,0000. The default interest rate under the Loan is 8.95%.[5]

13. Perry L. Pavicic ("Pavicic" or "Guarantor"), in his individual capacity, executed a Commercial Guaranty dated December 17, 2019 to BofH to secure the Debtor's obligations under the Loan.[6] Upon information and belief, Pavicic is also the managing member of the Debtor.

14. Debtor defaulted under the Loan by, *inter alia*, failing to (i) make the required payments to BofH, including the final maturity payment due on the Maturity Date; (ii) pay no less than $595,340.91 in real estate taxes owed for the Real Property when due; (iii) comply with numerous financial covenants in the Loan agreements; and (iv) provide to BofH certain required tax documents of the Debtor and Pavicic.[7]

15. As of September 23, 2025, the Debtor was obligated to BofH in the sum of not less than $23,923,147.06, comprised of the unpaid principal balance in the amount of $22,846,126.61, accrued interest in the amount of $1,061,910.91, late charges in the amount of $22,939.24, and forced placed insurance premium in the amount of $1,170.33.[8]

***c. The Foreclosure Action, the Appointment of Receiver, and the Pre-Petition Sale***

16. On June 20, 2025, BofH filed a foreclosure complaint with the State Court titled *Bank of Hope v. Hamilton Street Associates LLC, et al.*, Docket No. SWC-F-006722-25 (the "Foreclosure Action"), against the Debtor, Pavicic, G2 Finance, LLC, G2Elite Property, LLC, John Park, and Joseph Lee. BofH named G2Finance, LLC, G2Elite Property, LLC ("G2Elite"), John

[5] *See* Malatak Decl. Ex. A at Gap Note, Ex. B at Mortgage Modification.
[6] Malatak Decl. Ex. E – Commercial Guaranty.
[7] Malatak Decl. Ex. F – Foreclosure Complaint.
[8] *Id.*

Park ("Park"), and Joseph Lee (collectively, the "G2 Parties") for notice purposes, as they were involved in litigation with the Debtor and Pavicic involving the Real Property, as discussed in greater detail below (the "Member Litigation"). Subsequently, BofH filed an amended complaint in the Foreclosure Action on November 25, 2025, where BofH removed the G2 Parties, and added Honors Review Princeton, LLC, KBG Express Somerset, LLC and Little Honors, LLC, as defendants (collectively, the "Leasehold Defendants").[9]

17. On July 11, 2025, BofH filed a motion in the Foreclosure Action to appoint a rent receiver for the Real Property. On August 1, 2025, the State Court entered an Order (the "Original Receiver Order") appointing Tim Paulus of Wick Companies, LLC as receiver for the Real Property.[10] The Original Receiver Order provided that the

> Receiver shall be empowered and directed in its capacity as a fiduciary and officer of the Court to forthwith enter upon and take possession of the Mortgaged Property and to manage, take charge, preserve and safeguard the Mortgaged Property, and to demand, collect and receive all of the rents, issues and profits thereof now due, if any, and unpaid or hereinafter to become due related to the Mortgaged Property….[11]

18. In addition to granting the Receiver broad powers to carry out his duties vis-à-vis the Real Property, the Original Receiver Order imposed numerous obligations on the defendants and other third-parties, including requiring the Debtor, Pavicic, and the G2 Parties to immediately vacate the Real Property and deliver possession, control, and management of the Real Property to the Receiver. The Original Receiver Order directed the Receiver to post a $370,000 bond.[12]

19. On March 30, 2026, BofH filed a motion to enlarge the powers of the Receiver, including marketing and sale of the Real Property.[13] On May 8, 2026, the State Court entered an

---

[9] *Id.*
[10] Malatak Decl. Ex. G – Original Receiver Order.
[11] *Id.* at 2.
[12] *See id.*
[13] Malatak Decl. at ¶ 17.

Order (the "Enlargement Order" and, together with the Original Receiver Order, as the "Receiver Orders"), granting the motion to enlarge the Receiver's powers, including with the authority to sell the Real Property by public or private sale, subject to approval by the State Court.[14] The Receiver was permitted to collect a commission of 6% in the case of a public or private sale or 3% if the matter resolved without a sale.[15]

20. On August 28, 2026, BofH filed a motion (the "Receiver Sale Motion") with the State Court seeking, among other relief, approval of an executed Contract of Sale to sell the Real Property entered into by the Receiver and AV Hamilton, LLC (the "Current Buyer") as buyer for the total purchase price of $23,500,000.00 free and clear of all liens with the liens to attach to the proceeds in the determined order of priority pursuant to *N.J.S.A.* 2A:50-31.[16] The Receiver Sale Motion was noticed and marked with a September 11, 2026 return date.

21. After the Court entered the Enlargement Order, the Receiver and Wick extensively marketed the Real Property as detailed in the Receiver's certification in support of the Receiver Sale Motion. Wick conducted over fifteen (15) tours of the Real Property with prospective buyers and received nine (9) written offers and an additional five (5) verbal offers.[17] Offers were received from buyers operating as close as Somerset County, along with buyers from as far away as California.[18] Many of the offers received came from well-known multi-family developers, some of whom own in excess of 2,500 apartment units. One prospect who expressed interest owns in excess of 100,000 apartment units.[19]

---

[14] Malatak Decl. Ex. H – Enlargement Order.
[15] *Id.* at 2.
[16] Malatak Decl. Ex. I – Receiver Sale Motion.
[17] Paulus Decl. Ex. B – Cert. in Support of Receiver Sale Motion at ¶ 6.
[18] *Id.*
[19] *Id.*

22. The offers for the Real Property ranged from $16,500,000 to $23,500,000.[20] Ultimately, the Receiver selected the Current Buyer because it offered the highest purchase price for the Real Property, and the Current Buyer's offer also contained no financial contingencies. The Receiver and Wick were confident that the Successful Bidder could close shortly after receiving the State Court's approval.[21]

23. On September 10, 2026, Debtor filed its chapter 11 petition, which was one day prior to the September 11, 2026 return date for the Receiver Sale Motion.

***d. Defalcation and Mismanagement of the Real Property***

24. On April 28, 2025, the Member Litigation was initiated by Pavicic and the Debtor in the Superior Court of the State of New Jersey, Chancery Division, No. SOM-C-12028-25 against the G2 Parties alleging diversion of rents by those parties and asserted causes of action, including: common law and statutory breaches of fiduciary duties, state statutory violations of New Jersey's Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-1, et seq. ("RULLCA"), and breach of contract with respect to the oral contract to manage the Real Property.[22]

25. On May 12, 2025, the G2 Parties answered and asserted counterclaims for, *inter alia*, breach of contract, civil conspiracy, constructive fraud and breach of fiduciary duty. To support its counterclaims, the G2 Parties alleged that Pavicic: failed to fulfill his duties to them under the Debtor's Operating Agreement; converted funds intended to be utilized for the payment of real estate taxes; received funds that were directed to the joint property projects but instead utilized those funds for his own purposes; received loans of several millions of dollars for the

[20] *Id.* at ¶ 8.
[21] *Id.* at ¶ 9.
[22] *See* Malatak Decl. Ex. J – Member Litigation First Amended Complaint.

Hamilton Street project for which he utilized for his own benefit; and breached his fiduciary duties as managing member of Hamilton Street Associates.[23]

26. In the Member Litigation, Pavicic and the G2 Parties each have alleged that the other has diverted rents and security deposits away from the Real Property for their own personal benefit. For instance, Park alleges in a certification that Pavicic converted hundreds of thousands of dollars of security deposits.[24] Pavicic alleged in his certification that rental income was paid into a Debtor account maintained by G2Elite and then "transferred out to other accounts", and attached thereto a bank statement reflecting transfers of the funds to non-Debtor accounts.[25]

27. Among the grounds the State Court cited for granting relief, it explicitly recognized in the Original Receiver Order that the Member Litigation raised concerns – including "[q]uestions regarding allocation of rent received" and the diversion of rents to restore security deposits – that warranted the appointment of the Receiver.[26]

28. In addition, as of the filing of the foreclosure complaint, the Debtor failed to pay real estate taxes totaling $595,340.91. The State Court recognized this delinquency as another availing ground for appointment of the Receiver.[27]

***e. Efforts by the Receiver to Preserve the Real Property***

29. After his appointment, the Receiver learned that Pavicic had acted, through his company Recon Services LLC ("Recon"), as the general contractor for the construction of the building and the making of improvements to the Real Property.

[23] *See* Malatak Decl. Ex. K – Member Litigation Counterclaims.
[24] Malatak Decl. Ex. L – Park Cert. at ¶¶ 13, 24.
[25] Malatak Decl. Ex. M – Pavicic Cert. at ¶ 3 & Pavicic Cert. Ex. B.
[26] Malatak Decl. Ex. G – Original Receiver Order at 22.
[27] *Id.* ("[D]efendants have failed to pay real estate taxes on the Property totaling $595,340.91. This delinquency amounts to a priority lien, which threatens plaintiff's lien position.").

30. Since his appointment, the Receiver has undertaken substantial repairs to the Real Property. Recently, the Receiver was forced to repair and replace whole sections of the parking garage's steel decking which had rusted due to an improperly installed drain.[28] It is estimated that the costs for this work will total between $25,000 – $30,000. The steel decking had deteriorated so severely that it raised concerns of a potential collapse in the underground parking deck.[29] In addition, as set forth in the Original Receiver Order, the Receiver was required by an insurance carrier to expend $35,521.98 to perform repairs to the sidewalk adjacent to the Real Property to cure trip hazards.[30]

***f. Net Income Since Appointment of Receiver***

31. As reflected by the Receiver's monthly reports, for the 12-month period from August 2025 through July 2026 after the Receiver's appointment, the Real Property has generated $778,037.73 in net income.[31] During the second quarter of 2026 (the most recent full quarter), the Real Property generated $143,831.84 in net income.[32]

## IV. BASIS FOR RELIEF REQUESTED

32. Sections 543(a) and (b) of the Bankruptcy Code provide that a custodian "may not make any disbursements from, or take any action in the administration of, property of the debtor" and shall "deliver to the trustee any property of the debtor held by or transferred to such custodian." 11 U.S.C. §§ 543(a)-(b)(1). Instead, custodians with knowledge of the commencement of a bankruptcy case concerning the debtor must cease administration of the debtor's property, deliver to the trustee any property of the debtor held by or transferred to such custodian, except such action

[28] Paulus Decl. at ¶ 14.
[29] *Id.*
[30] *See* Malatak Decl. Ex. H – Enlargement Order at 9.
[31] Paulus Decl. Ex. G – Table of Monthly Net Income.
[32] *Id.* ¶ 18.

as is necessary to preserve such property. 11 U.S.C. §§ 543(a) and (b). A state court receiver is a "custodian" under sections 543 and 101(11) of the Bankruptcy Code. *See* 11 U.S.C. § 101(11) (defining "custodian"); *In re CCN Realty Corp.,* 19 B.R. 526, 528 (Bankr. S.D.N.Y. 1982).

33. Section 543(d)(1) of the Bankruptcy Code provides that this Court may "excuse compliance [with the turnover requirements of Sections 543(a) and (b)] . . . if the interests of creditors . . . would be better served by permitting a custodian to continue in possession, custody, or control [of the debtors' assets]." 11 U.S.C. § 543(d)(1); *see also In re LCL Income Props., L.P. VI,* 177 B.R. 872, 874 (Bankr. S.D. Ohio 1995); *In re Poplar Springs Apartments of Atlanta, Ltd.,* 103 B.R. 146, 149 (Bankr. S.D. Ohio 1989). "[S]ubsection (d) is an abstention policy which permits the custodianship to continue if the best interest of creditors and stockholders is served . . . ." *In re Sundance Corp.,* 83 B.R. 746, 747 (Bankr. D. Mont. 1988). *See also In re WPAS,* 6 B.R. 40, 43 (Bankr. M.D. Fla. 1980).

34. "A Court considering whether to exercise its discretion under section 543(d)(1) may consider several factors indicative of whether the interests of creditors would be better served [by permitting a custodian to continue in possession]." *See In re Dill*, 163 B.R. 221, 225 (Bankr. E.D.N.Y. 1994). These factors include:

a. whether there will be sufficient income to fund a successful reorganization;

b. whether the debtor will use the turnover property for the benefit of the creditors;

c. whether there has been mismanagement by the debtor;

d. whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; and

e. the fact that the bankruptcy automatic stay has deactivated the state court receivership action.

35. Notably, "[t]he interests of the debtor . . . are not part of the criteria considered when applying section 543(d)(1)." *Id.*; *see In re Falconridge, LLC*, No. 07-BK-19200, 2007 WL 3332769, at *7 (Bankr. N.D. Ill. Nov. 8, 2007) ("The interests of the debtor are not to be considered in the court's decision."). Even if the factors are ultimately resolved in favor of the Debtors, the Court may excuse compliance if turnover would be injurious to creditors. *In re Poplar Springs Apartments of Atlanta, Ltd.,* 103 B.R. at 150. In fact, where it will better serve creditors, bankruptcy courts in other districts have excused custodians from the turnover requirements of section 543 of the Bankruptcy Code. *See, e.g., In re LCL Income Props., L.P. VI,* 177 B.R. 872 (Bankr. S.D. Ohio 1995) (granting motion to excuse turnover, even without showing of mismanagement, where the receivership did not appear detrimental to the debtor's ability to reorganize, and, in the event that the reorganization failed, the reinstalment of the receiver would cause unnecessary trouble and expense).

36. Consideration of the relevant section 543(d)(1) factors makes clear in this case that the Receiver's continued administration of the Debtor's Real Property is in the best interests of creditors.

37. First, there is insufficient income generated by the Real Property to fund a successful reorganization under any circumstances. During the second quarter of 2026, the Real Property generated $143,831.84 in net income during which time *no payments* were made to BofH. Prior to the Loan's Maturity Date, the monthly principal and interest payment due under the Loan was $114,696.32 based on the non-default rate of 3.95% amortized on a 30-year schedule. Thus, the Debtor's net income would need to increase nearly threefold to service the debt owed to BofH

while paying operating expenses, assuming for discussion purposes the 3.95% non-default rate applied. However, a refinancing or cramdown of the Loan would result in a significantly higher rate and further increase the Debtor's debt burden. Interest rates since December 2019 have significantly increased. To illustrate, if the *Till* rate were to apply to a cramdown of the Loan, the applicable rate would be the prime rate – currently at 7% – plus a risk adjustment factor of 1%-3%.[33] As additional context, on December 1, 2019 the U.S. 10-year treasury note rate was approximately 1.822%[34] while on September 16, 2026 the rate was approximately 5.023%.[35] A reorganization other than accomplished through a sale of the Real Property appears implausible.

38. Second, Debtor's conduct demonstrates that turning-over management and control of the Real Property to the Debtor would harm creditors. Debtor clearly timed its bankruptcy filing to derail the sale by the Receiver, which followed an extensive and successful advertising/marketing process, which attracted multiple competitive offers. As explained above, the Debtor's only realistic reorganizational path is to seek a sale of the Real Property.

39. Third, permitting Pavicic to regain control of the Real Property would expose the bankruptcy estate to the risks of value-destructive litigation between the Debtor's members, in addition to handing management to an individual, who has been accused of misappropriating tenants' security deposits and rents. The State Court's decision to appoint the Receiver was heavily influenced by the allegations raised in the Member Litigation. The State Court reasoned that those allegations of diversion of security deposits and rents compelled the appointment of the Receiver.[36] Even putting aside those allegations, Debtor's members are embroiled in acrimonious and ongoing

---

[33] *See Till v. SCS Credit Corp.*, 541 U.S. 465 (2004).
[34] *See* https://www.wsj.com/market-data/quotes/bond/BX/TMUBMUSD10Y/historical-prices.
[35] *See* https://www.wsj.com/market-data/quotes/bond/BX/TMUBMUSD10Y/historical-prices.
[36] *See* Original Receiver Order at 22 ("Rent funds have been diverted to restore security deposits of tenants, which jeopardizes defendants' ability to satisfy the financial needs of the Property.").

litigation, which strongly favors permitting an independent fiduciary, removed from the Member Litigation, to neutrally oversee the Debtor's primary asset.

40. For the above reasons set forth above, the Court should excuse the Receiver's compliance with section 543(a)-(c) and permit the Receiver to continue his role pursuant to the Receiver Order during the Debtor's chapter 11 case.

## V. CONCLUSION

41. For all the foregoing reasons, BofH respectfully requests this Court enter an order: (i) excusing the Receiver from compliance with Bankruptcy Code sections 543(a), (b), and (c); (ii) permitting the Receiver to continue to possess, control, and manage property currently under the Receiver's control pursuant to the Receiver Orders; and (iii) ordering any such other relief the Court deems appropriate.

Dated: New York, New York
September 25, 2026

WINDELS MARX LANE & MITTENDORF, LLP

By: */s/ Robert J. Malatak*____________________

Robert J. Malatak (rmalatak@windelsmarx.com)
Eloy A. Peral (eperal@windelsmarx.com)
Reed T. Cohn (rcohn@windelsmarx.com)
156 West 56th Street
New York, New York 10019
Tel: (212) 237-1000

*Attorneys for Bank of Hope*

**EXHIBIT A**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, New York 10019
Tel. (212) 237-1000
Attorneys Appearing:
Robert J. Malatak
Eloy A. Peral (*pro hac vice* admissions requested)
Reed T. Cohn
rmalatak@windelsmarx.com
eperal@windelsmarx.com
rcohn@windelsmarx.com

*Attorneys for Bank of Hope*

| | |
|---|---|
| In re<br><br>Hamilton Street Associates, LLC,<br><br>Debtor. | Chapter 11<br>Case No. 26-20342-cmg<br><br>RETURN DATE: TBD<br><br>Judge Christine M. Gravelle |

**ORDER GRANTING MOTION OF BANK OF HOPE FOR ENTRY OF AN ORDER (I) EXCUSING RECEIVER'S COMPLIANCE WITH TURNOVER PROVISIONS OF 11 U.S.C. § 543, (II) AUTHORIZING THE RECEIVER TO REMAIN IN POSSESSION PURSUANT TO 11 U.S.C. § 543(d)(1), AND (III) GRANTING RELATED RELIEF**

The relief set forth on the following pages, numbered two (2) through three (3), is hereby

**ORDERED.**

Upon the motion of Bank of Hope ("**BofH**" or "**Movant**") pursuant to 11 U.S.C. § 362(d) for the entry of an order for entry of an order attached hereto as **Exhibit "A"** (i) excusing Tim Paulus, Esq. (the "**Receiver**") of Wick Companies, LLC ("**Wick**") from compliance with sections 543(a), (b), and (c) of title 11 of the United States Code (the "**Bankruptcy Code**"); (ii) permitting the Receiver to continue to possess, control, and manage property currently under the Receiver's control pursuant to the Receiver Orders[37] entered in the Foreclosure Action brought by BofH in the Superior Court of the State of New Jersey; and (iii) granting related relief (the "**Motion**"); and upon the Declarations of Robert J. Malatak and Tim Paulus and the exhibits attached therewith each declaration; and venue being proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b); and notice of the Motion being sufficient under the circumstances; and it appearing that no other or further notice need be provided; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief granted herein; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and after due deliberation and sufficient cause appearing therefor; it is hereby **ORDERED** that:

1. The Motion is granted to the extent set forth herein.

2. The Receiver and Wick are excused from compliances with Bankruptcy Code sections 543(a), (b), and (c).

3. The Receiver is permitted to continue to possess, control, and manage property currently under the Receiver's control pursuant to the Receiver Orders.

4. This Order shall be immediately effective and enforceable upon its entry.

5. The Debtor and/or the Receiver, as the case may be, are hereby authorized and

[37] Terms not defined herein shall the meanings given to them in the Motion.

empowered to take all actions necessary to implement the relief granted in this Order.

6. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.